STATE OF CONNECTICUT *v.* STEPHEN M. COSGROVE

STATE OF CONNECTICUT *v.* THOMAS PIERRO

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued April 2—decision released July 29, 1980

*Richard T. Meehan, Jr.,* for the appellant (defendant Cosgrove).

*David M. Reilly, Jr.,* for the appellant (defendant Pierro).

*Donald A. Browne,* state's attorney, with whom, on the brief, were *Frank S. Maco,* assistant state's attorney, and *Theresa A. Brown,* law student intern, for the appellee (state).

COTTER, C. J.   The defendants were convicted after a combined trial to a jury of unlawfully possessing marijuana with the intent to sell or dispense it in violation of General Statutes § 19-480 (b).[1] Upon the trial court's denial of their motions for

---

[1] General Statutes § 19-480 (b) reads: "PENALTY FOR ILLEGAL MANUFACTURE, DISTRIBUTION, SALE, PRESCRIPTION, DISPENSING. . . . (b) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with intent to sell or dispense, possesses with intent to sell or dispense, offers, gives or administers to another person any controlled substance, except a hallucinogenic substance other than marihuana, or a narcotic substance except as

a new trial and for acquittal, they have appealed. Because the issues raised by each defendant on appeal are identical, with the one exception of the defendant Stephen Cosgrove's claim of error with regard to the admission in evidence of certain extrajudicial statements of his codefendant Thomas Pierro, we consider the two appeals in a single opinion.

From the evidence presented the jury could reasonably have found: On the morning of December 9, 1976, at approximately 1:30 a.m., two off-duty Stamford police officers were patrons of a drinking establishment in Port Chester, New York. The officers, who were in plain clothes at that time, met and conversed with the defendants Cosgrove and Pierro. During the conversation the defendant Pierro asked the officers if they could "handle some smoke?" He then told them that after coming from Miami, Florida with 150 pounds of marijuana and having sold approximately 90 to 100 pounds, he now had 50 or 60 pounds which he described as being "Columbian red" and if they were interested, he would be at room 302 of the Showboat Motor Inn in Greenwich. The defendants Pierro and Cosgrove then left the New York drinking establishment.

The Stamford police officers then proceeded to the Showboat Motor Inn in Greenwich and were admitted into room 302 by the codefendants at 4:30 a.m. Cosgrove pulled a large green plastic bag from under a bed in the room and gave it to

authorized in this chapter, may, for the first offense, be fined not more than one thousand dollars or be imprisoned not more than seven years or be both fined and imprisoned; and, for each subsequent offense, may be fined not more than five thousand dollars or be imprisoned not more than fifteen years, or be both fined and imprisoned."

Pierro who removed a handful of plant-like material which appeared to the officers to be marijuana and which Pierro gave to them in a paper bag. The officers told Pierro that they were interested in buying the marijuana but had to make a "connection" for the money; Pierro then told them that if they wanted to make a purchase they would have to return before 11 a.m. because he and Cosgrove were returning to Miami.

After the officers left the Showboat Motor Inn, they immediately went to the Stamford police station where they performed a field test on the plant sample given them by Pierro. The officers then prepared and secured a search warrant for room 302 of the Showboat Motor Inn and proceeded with that warrant to the town of Greenwich police department. In Greenwich, two Greenwich police officers were assigned to participate in the execution of the warrant.

The Stamford and Greenwich police officers then went to the motor inn, entered room 302, seized the two green plastic bags from under the bed in which the defendant Cosgrove had been, and placed the defendants under arrest. The two bags were taken by the Greenwich police officers to the Greenwich police station where they were tagged as evidence by the officers. These bags were subsequently transported to the state laboratory where analysis revealed that the plant-like substance in them was marijuana; the combined weight of the bags was found to be twenty-three pounds, two ounces.

## I

Of the defendants' numerous challenges to the trial court's rulings, the first they have preserved for appeal centers on the admission of the state

toxicological report which they claim, inter alia, did not comply with the business entry rule provided for in General Statutes § 52-180—admissibility of business entries and photographic copies.[2] In the present case the state did not seek admission of the report pursuant to General Statutes § 19-483 (b),[3] but only sought to introduce it as a business record under § 52-180 through a founda-

---

[2] General Statutes § 52-180 provides in pertinent part: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of such act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of such business to make such writing or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter. Such writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of such evidence, but not to affect its admissibility."

[3] At trial, the defendants first objected to admission of the state toxicological report on the grounds that in order to introduce the report the state had to forward to opposing counsel by certified mail a copy of the document, and a copy had been mailed and received only through ordinary mail service. The defendant argued that General Statutes § 19-483 (b) established as a condition precedent to the admission of a toxicological report the necessity for giving opposing parties notice by certified mail of the intent to use such a report. The defendants misread the statutory language of § 19-483 (b), as the trial court correctly pointed out, and as the defendants apparently now recognize by having abandoned this claim on appeal.

In pertinent part, General Statutes § 19-483 (b) provides: "A copy of such report certified by the analyst shall be received in any court of this state as competent evidence of the matters and facts therein contained at any hearing in probable cause, pretrial hearing or trial. If such copy is to be offered in evidence at a trial, the attorney for the state shall send a copy thereof, by

tion laid by Ronald Hennessey, a Greenwich police officer and Dr. Charles N. Reading, a toxicologist employed by the Connecticut department of health.

The toxicological report concerned the two bags of marijuana seized in room 302 of the Showboat Motor Inn and was admitted into evidence as state's exhibit G. Initially, the upper half of the report, which had been typed at the Greenwich police station and which described the items being submitted to the toxicology laboratory of the state department of health, was admitted without objection during the testimony of officer Hennessey. The bottom half of the report, which described the material examined,

certified mail, to the attorney of the defendant who has filed an appearance of record or, if there is no such attorney, to the defendant if such defendant has filed an appearance pro se, and such attorney or defendant, as the case may be, shall, within five days of the receipt of such copy, notify the attorney for the state, in writing, if he intends to contest the introducion of such certified copy. No such trial shall commence until the expiration of such five-day period and, if such intention to contest has been filed, the usual rules of evidence shall obtain at such trial." This language was enacted in 1971 by Public Act No. 164; see *State* v. *Marsh*, 168 Conn. 520, 529–30 n.3, 362 A.2d 523; and is clearly intended to permit the introduction of a toxicological report without a toxicologist being present to testify personally to its nature as a business record if the defendant does not object. Section 19-483 (b) ensures that a toxicological report will not be admitted without the defendant's receiving notice and an opportunity to object to its admission. This purpose was also iterated by the senator who sponsored the amendment which added the *above* quoted language to § 19-483 (b). "This bill permits a certified copy of the toxicologist's report to be admitted in evidence in a criminal proceeding. And as I already indicated it can only be admitted after the prosecuting attorney has given notice to the defendant who has filed an appearance pro se or to the defendant's attorney who has filed an appearance of record. The objective of this bill, of course, is to eliminate congesting of dockets in the Circuit Court as a result of waiting to bring the toxicologist in, who has to testify personally." Substitute Senate Bill 413, An Act Concerning Acceptance of Analysis by the State Toxicological Laboratory as Legal Evidence, 1971 S. Proc., pt. 3, vol. 14, p. 1152.

the examinations performed by the laboratory, and the results of the examinations which determined the substances to be marijuana, was admitted over objection during the testimony of Dr. Reading.

Neither at trial nor on appeal did the defendants contend that the toxicologist's report was inadmissible because it did not satisfy the three tests required by § 52-180: that the report was made in the regular course of the state toxicologist's business, that it was in the regular course of his business to make such a report, and that the report was made when the laboratory tested the items at issue or within a reasonable time thereafter. See *American Oil Co.* v. *Valenti,* 179 Conn. 349, 355–56, 426 A.2d 305; *Hutchinson* v. *Plante,* 175 Conn. 1, 4, 392 A.2d 488.[4] Dr. Reading's testimony clearly demonstrated that the report met the requirements of § 52-180. Rather, on appeal, the defendants claim that the toxicologist's report was inadmissible pursuant to § 52-180 because the chemical analyst's notes which Dr. Reading relied on to an extent in preparing the report were not produced at trial. The defendants seem to maintain that only the notes would constitute admissible business records.[5]

It is well-settled that permissible information in a business entry or record may include information

[4] It has been long established that General Statutes § 52-180 applies to criminal as well as civil cases. *State* v. *Hayes,* 127 Conn. 543, 598, 18 A.2d 895.

[5] At trial the defendants' initial objections to the toxicological report's entry was that it failed to comply with General Statutes § 19-483 (b); see footnote 3, supra; and violated their right of confrontation under the federal constitution because of the analyst's unavailability to testify. Sometime after the report was admitted, the defendants objected to the fact that the analyst's notes were not produced, but the thrust of the objection appeared to be not that the notes were necessary for compliance with General Statutes

garnered from other persons whose business duty involved submitting that information for inclusion in the report or entry. E.g., *Hutchinson* v. *Plante*, supra, 5; *Mucci* v. *LeMonte*, 157 Conn. 566, 569, 254 A.2d 879; *D'Amato* v. *Johnston*, 140 Conn. 54, 59, 97 A.2d 893. It is undisputed that it was the business duty of the analyst to submit information to the toxicologist for inclusion in his report.

## II

The defendants' second claim of error with respect to the toxicological report is that its admission violated the defendants' right of confrontation under the sixth and fourteenth amendments to the United States constitution because the report contained statements of a laboratory chemist that the material under examination was determined to be marijuana and that the chemical analyst was not called to the witness stand to testify. In the present case, Ms. Pernitis, a toxicological chemist who was under the supervision of Dr. Reading, was directed by him to examine the material taken from the defendants for the presence of marijuana. Dr. Reading reviewed and examined the results of her report, and testified that he came to an independent conclusion that the nature of the substance examined was marijuana.

Since this court has recently determined that the admission of the testimony of a state toxicologist

§ 52-180 but that their absence was a violation of the defendants' right of confrontation. Although generally appellants are confined to the ground of objection made at trial; *State* v. *Rado*, 172 Conn. 74, 81, 372 A.2d 159; *State* v. *Johnson*, 166 Conn. 439, 444–45, 352 A.2d 294; because it appears that the defendants' objections can be possibly interpreted as ones impinging on the admissibility of the toxicological report as a business record, we address the merits of the defendants' claim on appeal.

in these circumstances did not deprive a criminal defendant of the right of confrontation guaranteed by the federal constitution; *State* v. *Reardon,* 172 Conn. 593, 599, 600, 376 A.2d 65; and because similar, if not identical, considerations are involved in determining whether the admission of a toxicological report, which is unaccompanied by the testimony of the laboratory personnel who performed tests whose results appear in the report, is violative of a criminal defendant's right of confrontation, we would ordinarily be in a position to treat the defendants' claim here with relative dispatch. Because of the recent ruling, however, of the Connecticut District Court in *Reardon* v. *Manson,* No. H-77-240 (D. Conn., April 28, 1980) (appeal pending), and *Hawkins* v. *Steinert,* No. H-77-497 (D. Conn. April 28, 1980) (appeal pending), granting petitioners' application for writs of habeas corpus and in view of the Second Circuit's opinion in *United States* v. *Oates,* 560 F.2d 45 (2d Cir.), which ostensibly set guidelines for the district court's decision in *Reardon* v. *Manson,* supra, we think that it is appropriate to examine carefully the present claim raised by the defendants with an eye ultimately cast toward the concerns evinced in the Second Circuit and Connecticut district court opinions just noted.

As the Supreme Court has noted, its holding in *Pointer* v. *Texas,* 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923, that "the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right . . . made obligatory on the States by the Fourteenth Amendment" forms merely the beginning of an inquiry into whether an extrajudicial statement introduced at a state criminal trial violates the confrontation clause. *Dutton* v. *Evans,* 400 U.S. 74, 79, 91 S. Ct.

210, 27 L. Ed. 2d 213 (plurality opinion; hearsay rules are not equated with the confrontation clause). The court has been careful to establish that the constitutional right of confrontation does not require that hearsay evidence can at no time be admitted. E.g., *Parker* v. *Randolph,* 442 U.S. 62, 73, 99 S. Ct. 2132, 60 L. Ed. 2d 713 (plurality opinion); *Dutton* v. *Evans,* supra, 80; *Pointer* v. *Texas,* supra, 407. On the other hand, neither is a particular declaration to be determined not violative of the right of confrontation of a criminal defendant solely because state law provides for its admission as an exception to its evidentiary rules governing hearsay. E.g., *California* v. *Green,* 399 U.S. 149, 155–56, 90 S. Ct. 1930, 26 L. Ed. 2d 489. In determining whether a particular statement is sufficiently trustworthy to be admitted in evidence, "[t]he focus of the Court's concern has been to insure that there 'are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant,' *Dutton* v. *Evans,* supra, at 89, and to 'afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement.' *California* v. *Green,* supra, at 161." *Mancusi* v. *Stubbs,* 408 U.S. 204, 213, 92 S. Ct. 2308, 33 L. Ed. 2d 293.[6]

To consider fulfillment of § 52-180's requirements for the admission of business records in evidence as

[6] In *Dutton* v. *Evans,* 400 U.S. 74, 88–89, 91 S. Ct. 210, 27 L. Ed. 2d 213, the court did not delineate the indicia of reliability in a manner which readily permitted other courts to derive general considerations which would constitute a standard for testing claims under the confrontation clause. Compare *Chambers* v. *Mississippi,* 410 U.S. 284, 300–301, 93 S. Ct. 1038, 35 L. Ed. 2d 297, and *United States* v. *Guillette,* 547 F.2d 743, 754 (2d Cir.), cert. denied, 434 U.S. 839, 98 S. Ct. 132, 54 L. Ed. 2d 102. Nor have succeeding

sufficient indicia of reliability to satisfy the dictates of the confrontation clause would be but a specific way of acknowledging that "hearsay rules and the Confrontation Clause are generally designed to protect similar values." *California* v. *Green,* supra, 156. Cf. *Dutton* v. *Evans,* supra, 95–96 (Harlan, J., concurring). The Supreme Court has long acknowledged that certain kinds of hearsay evidence may be admitted without violating the confrontation clause. E.g., *Mattox* v. *United States,* 146 U.S. 140, 151, 13 S. Ct. 50, 36 L. Ed. 917 (dying declarations); *Mattox* v. *United States,* 156 U.S. 237, 240–44, 15 S. Ct. 337, 39 L. Ed. 409 (former testimony of deceased witness); *Pointer* v. *Texas,* supra, 407 ("[t]here are other analogous situations [to those in the two *Mattox* cases, supra] which might not fall within the scope of the constitutional rule requiring confrontation of witnesses"). Nonetheless, our holding on this issue is not and need not be grounded solely on the fact that § 52-180 and the confrontation clause may serve to exclude the same evidence and conversely also allow admission of the same evidence[7] but rather is also based on the nature of the toxicological report as a business record.[8]

Supreme Court decisions on the subject attempted to give guidelines as to what necessarily constitutes indicia of trustworthiness. See, e.g., *Mancusi* v. *Stubbs,* 408 U.S. 204, 213, 92 S. Ct. 2308, 33 L. Ed. 2d 293. Thus, it would seem that the case-by-case adjudication on claims involving the confrontation clause necessitated by Supreme Court decisions also is meant not to curtail a priori the state courts' ability to develop the law of evidence in this area. See *Dutton* v. *Evans,* supra, 95–96 (Harlan, J., concurring).

[7] Compare *United States* v. *Oates,* 560 F.2d 45, 66–80 (2d Cir.), where the court acknowledged that federal lawmakers sought assiduously to avoid collisions with the confrontation clause when drafting language of certain exceptions to the hearsay rule.

[8] Our particular concern here is that the contents of certain documents or writings may be admissible under § 52-180 but may run

In *State* v. *Kreck*, 86 Wash. 2d 112, 542 P.2d 782, the Washington Supreme Court under similar circumstances confronted a claim that a report of a chemical blood sample analysis prepared under the supervision of the Washington state toxicologist, who conferred with the chemist conducting the tests and personally verified the results, was inadmis-

aground the confrontation clause. In Connecticut, we have approved the evidentiary admission of hospital records containing opinions. E.g., *Kelly* v. *Sheehan*, 158 Conn. 281, 284–285, 259 A.2d 605 (hospital records detailing diagnosis, treatment and condition of a patient admissible under § 52-180); *D'Amato* v. *Johnston*, 140 Conn. 54, 59, 97 A.2d 893 (statement of expert in a hospital record that person is intoxicated is not inadmissible on the ground that the statement was of the entrant's opinion).

Recently, in a lengthy and lucid opinion discussing the parameters of the confrontation clause, the Maryland Court of Special Appeals held that where the jury had before it the testimony of four psychiatrists claiming the appellant was "insane," that of two psychiatrists claiming he was "sane," and a hospital record which contained the opinions of three more psychiatrists who also believed the appellant to be "sane," the confrontation clause served to exclude the opinions in the hospital records which were admissible under Maryland law. *Gregory* v. *State*, 40 Md. App. 297, 391 A.2d 437. The Maryland court determined that the opinions in the hospital record were such as should have been subject to cross-examination. The court emphasized that psychiatry is an inexact science and that reported appellate opinions reveal the frequency with which well-qualified practitioners express different and often widely varying opinions as to a criminal defendant's sanity and hence criminal responsibility. *Gregory* v. *State*, supra, 326. The Maryland opinion, upon which the defendants heavily rely, was, however, careful to emphasize that the record it had before it was not the routine record of a birth, death or body temperature nor was it "any other similar statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely." Id., 326. While we stress that we do not decide whether we would agree with the Maryland court that statements of such opinions in a hospital record would necessarily violate the confrontation clause, we note that the toxicological report before us is readily distinguishable from such opinions and should be considered a "statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely."

sible as violative of the sixth amendment because the chemist conducting the tests was not produced as a witness and the state made no attempt to obtain his testimony. The Washington court rejected the defendant's claim stating that the report met the requirements of its statute governing the admissibility of business records and that the statutory requirements for admissibility were particularly designed to ensure the reliability of the evidence. *State* v. *Kreck,* supra, 117–19.

Section 52-180 of the Connecticut statute providing for the admissibility of business records contains virtually the same requirements for admissibility as the Washington statute which is based on the Uniform Business Records as Evidence Act.[9]

The toxicological report was made in the regular course of the toxicological laboratory's business and it was in the regular course of the laboratory's business to make such a report, two requirements which signify the absence of "a motive and opportunity to falsify the record." McCormick, Evidence (2d Ed.) § 308, p. 724. Furthermore, the report was made on March 22, 1977, one day after the tests were conducted. This clearly fulfills § 52-180's requirement that record be made at the time of or within a reasonable time after the act, transaction, occurrence or event recorded to ensure that the report is not subject to the inaccuracies caused by lapse of time.

---

[9] Section 52-180 is identical to the New York state provision; see N.Y. Civil Practice Act § 374-a. The New York provision is sufficiently similar to the uniform act for New York to be considered one of the states which had adopted the uniform act; see 9 Uniform Laws Annotated, 1950 Cumulative Annual Pocket Part, pp. 163–64. Connecticut's statute has also been considered to be similar to the Uniform Business Records as Evidence Act. *D'Amato* v. *Johnston,* 140 Conn. 54, 57, 97 A.2d 893.

In *Kay* v. *United States*, 255 F.2d 476, 481 (4th Cir.), in discussing the admission of a certificate describing the results of a chemical analysis to determine the alcoholic content of the defendant's blood, the court stated "the alcoholic content of the blood, the evidentiary fact sought to be proved by the certificate, may be accurately determined by well recognized chemical procedures. It is an objective fact, not a mere expression of opinion." The toxicological report in the present case recorded the results of well-recognized chemical and laboratory procedures. See *State* v. *Reardon*, supra, 595–96, where the microscopic, thin-layer chromatography, and chemical tests, which were also used in the present case, are described. The toxicological report in the present case cannot be considered to significantly differ from the laboratory reports in *Kay* v. *United States*, supra, or in *State* v. *Kreck*, supra, insofar as it contains a record of objective facts and not mere opinion. Moreover, the chemist reporting those facts would not only be free from any motive to falsify the records but would be under a strict duty as an employee and a scientist to make an accurate report to preserve her job and the integrity of the toxicological laboratory. The report here is the record of *routine* tests; *State* v. *Reardon*, supra, 598; which the laboratory performs thousands of times a year; *Reardon* v. *Manson*, supra, 3; and in light of their frequency are so generally considered reliable that they are normally undisputed.[10]

---

[10] In addition to the cases already noted, opinions in many other jurisdictions have upheld the admissibility of a laboratory report or similar record in the face of a sixth amendment objection. E.g., *Montgomery* v. *Fogg*, 479 F. Sup. 363 (S.D. N.Y.) (autopsy report); *State* v. *Larochelle*, 112 N.H. 392, 297 A.2d 223 (blood tests for alcohol either by examination or by breathalyzer); *United States ex rel. Lurry* v. *Johnson*, 378 F. Sup. 818 (E.D. Pa.) (hospital

Nonetheless, in *Reardon* v. *Manson, supra,* 11, the court asserted that identical tests performed by the same chemist, Ms. Pernitis, in the state toxicological laboratory contained no indicia of reliability. When, however, the underpinnings of the court's assertion are examined, the support for its conclusion disappears. That court initially stated that the test was not performed by a neutral third party, but by an important participant in the prosecutorial

report of medical findings and diagnoses based on patients' observable physical conditions); *Henson* v. *State,* 332 A.2d 773 (Del.) ("Emergency Services" hospital record containing personal identification information of rape victim and "physical findings."); *Collins* v. *State,* 267 Ind. 233, 369 N.E.2d 422 (autopsy report); *State* v. *Carter,* 591 S.W.2d 219 (Mo. App.) (laboratory report); *People* v. *Porter,* 46 App. Div. 2d 307, 362 N.Y.S.2d 249 (log book record of blood sample alcohol test); *Burleson* v. *State,* 585 S.W.2d 711 (Tex. Crim. App.) (autopsy report); *Robertson* v. *Commonwealth,* 211 Va. 62, 175 S.E.2d 260 (laboratory report of deputy chief medical examiner).

Where some jurisdictions have held the admission in evidence of certain, particularly medical, reports, to constitute a denial of a criminal defendant's right to confrontation, it is clear that most of these reports differ qualitatively from the one at issue in this case and others which have been held admissible over objections based on the confrontation clause. Unlike those cases which we have cited which concern reports of routine tests and offer opinions which are not generally or reasonably subject to divergent views; e.g., *United States ex rel. Lurry* v. *Johnson, supra,* 822; *Henson* v. *State, supra,* 775–76; the best reasoned of the cases holding reports inadmissible include those whose ratio decidendi appears to be that the opinions at issue in the reports are of kind which are frequently subject to varying interpretations. E.g., *Phillips* v. *Neil,* 452 F.2d 337 (6th Cir.) (medical reports containing statements which were only evidence before jury suggesting that defendant, who had raised insanity defense in murder prosecution, might be responsible for his actions); *Gregory* v. *State,* 40 Md. App. 297, 391 A.2d 437 (statements of psychiatrists in medical report concerning sanity of the defendant); *Commonwealth* v. *McCloud,* 457 Pa. 310, 322 A.2d 653, 655. See also *State* v. *Walker,* 53 Ohio St. 2d 192, 197–98, 374 N.E.2d 132 (restricting holding of *State* v. *Tims,* 9 Ohio St. 2d 136, 224 N.E.2d 348).

effort.[11] Id., 11. The chemist is employed in a completely different and separate agency of state government and owes no allegiance per se to the state's attorney who functions in a separate constitutional branch of state government. This characterization mistakes the nature of the chemist's role. In fact, the tests performed by the chemist could just as easily be seen as a check on the prosecutorial effort so as to ensure not only that proper convictions are obtained but also that further prosecutorial time is not expended if the substance examined is not contraband. It would be incumbent upon the chemist to take particular effort to ensure the reliability of tests not only because of her training as a scientist and to maintain her position as we noted previously, but also so that the prosecution could proceed or not with assurance.

Similarly we cannot agree with the court's impeachment of the tests' reliability on the ground that they were not purely mechanical. *Reardon* v. *Manson*, supra, 12. While we earlier conceded the tests were not purely mechanical, we noted that they fall well within the category of those types of tests whose reliability has been demonstrated and generally accepted and do not contain the degree of subjectivity that warrants the production by the state of the chemist who performed the tests. The

---

[11] This statement is derived from *United States* v. *Oates*, 560 F.2d 45, 68 (2d Cir.). It seems clear that the *Oates* court's determination that chemists are important participants in the prosecutorial process was as much an expedient decision as it was one based on the nature of a chemist's role. By so deeming the chemist the *Oates* court was able to hold the documents at issue to be inadmissible under the Federal Rules of Evidence; id., 68; and thus avoid deciding "serious questions of constitutional dimension." Id., 83.

tests performed by Ms. Pernitis cannot reasonably be equated in terms of subjectivity with the opinions of doctors as to a person's sanity.[12]

The third and last reason in *Reardon* v. *Manson,* supra, for totally impugning the tests' reliability is that the state placed nothing in the record to demonstrate the reliability or competence of the chemists. If this information was of concern to the defendants, they could readily have ascertained it by subpoenaing the chemists. The tests did not lack indicia of reliability because the chemists' qualifications were unknown; at most, further indicia of reliability were not added to the indicia already present.

The district court's opinion would have it seem that what divides us is a presumption in favor of the fairness and regularity of the state toxicological laboratory's effort on our part versus the opposite presumption on its part. *Reardon* v. *Manson,* supra, 12. Rather what divides us is the failure of that decision to recognize (1) that even if certain indicia of the report's reliability are absent there may exist other indicia which are sufficient; (2) that if the defendants in fact wanted to do so, they had sufficient means, through pretrial discovery; see *People* v. *Gower,* 42 N.Y.2d 117, 121, 366 N.E.2d 69; and subpoena power over the chemist; General Statutes § 54-2a; to investigate many of that court's concerns as to the toxicological report's reliability; and (3) that the state has valid reasons, beyond trial tactics and mere convenience for calling only Dr. Reading as a witness.

The antipathy of *Reardon* v. *Manson,* supra, 9, toward the state's procedures is such that it views

---

[12] See notes 8 and 10 supra.

the state's failure to produce the chemist at trial as an intentional and practically nefarious method of screening less-experienced witnesses from cross-examination and artificially strengthening its case by referring to the state toxicologist's doctorate. As we note later, the state's motives for not calling the chemist are clearly ones revealing serious concern both for the state's criminal trial procedures and the functioning of the toxicological laboratory. See, e.g., *Robertson* v. *Commonwealth*, 211 Va. 62, 64, 175 S.E.2d 260 (expressing similar concerns). Furthermore, reference to the doctoral degree of Dr. Reading, a witness who was not in the employ of the state's attorney, is equally clearly a step in qualifying him as an expert. To view the state's failure to call the chemist as a witness as a deliberate design to artificially strengthen its case is to ignore the practical realities of the trial situation. In the district court's own words, that court seeks to satisfy the defendants' "desire to confront the extra-judicial witnesses against them." Id., 6. The defendants here apparently also have such a desire,[13] but we do not read the confrontation clause as mandating in the circumstances of this case that we assuage their desire by requiring the state to call the chemist, Ms. Pernitis, as a witness.

We emphasize that both the questions raised by the district court and the Second Circuit panel in *United States* v. *Oates,* supra,[14] could readily have been asked of the chemist if she had been the

---

[13] It is noteworthy that the defendants do not challenge the fact that the plant material found in their possession was the substance analyzed by the state toxicological laboratory.

[14] The concerns raised by the District Court seem derived from the *Oates* decision which stated that the following inquiries on cross-examination arguably might have weakened the reliability of the chemist's finding of a contraband substance: the chemist's

defendants' witness. While a defendant may be disadvantaged in certain contexts by the prosecutor's failure to call the extrajudicial declarant; see, e.g., *Phillips* v. *Neil,* 452 F.2d 337, 348 (6th Cir.); those disadvantages would seemingly be inconsequential in the present case because of the defendants' ability to call the chemist as their own witness. See, e.g., *State* v. *Walker,* 53 Ohio St. 2d 192, 197, 374 N.E.2d 132. Moreover, it may well have been true that defendants' counsel, like Evans' counsel in *Dutton* v. *Evans,* supra, 88 n.19, concluded that subpoenaing the extrajudicial declarant in this case would not have been in the best interest of their clients.

The *Oates* court also suggested that the Supreme Court decisions in *Mancusi* v. *Stubbs,* 408 U.S. 204, 92 S. Ct. 2308, 33 L. Ed. 2d 293; *Dutton* v. *Evans,* 400 U.S. 74, 91 S. Ct. 210, 27 L. Ed. 2d 213; *Barber* v. *Page,* 390 U.S. 719, 88 S. Ct. 1318, 20 L. Ed. 2d 255; and *Pointer* v. *Texas,* 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923, lead to the conclusion that the government bears the burden of producing extrajudicial declarants, or of demonstrating their genuine unavailability whenever the extrajudicial statements being offered at trial are crucial to the government's case or devastating. *United States* v. *Oates,* supra, 83.

Leaving in abeyance the question of whether the *Oates* panel's suggestion that Supreme Court decisions have interpreted the confrontation clause as calling for another requirement beyond the suffi-

personal qualifications and experience; whether the tests were correctly performed; whether the procedures were recognized in the profession as being reliable and, if so, how reliable; and whether any machines used were in good working order. *United States* v. *Oates,* 560 F.2d 45, 81–82 (2d Cir.).

cient reliability of the extrajudicial statement for the admissibility of such evidence is apt,[15] we note that the toxicological report in the present case is not crucial to the state's case nor is it devastating. As we discuss in part IV of this opinion, there is other admissible evidence unrelated to the toxicological report sufficient to indicate that the substance found in the defendants' possession was marijuana.

Finally, we note that two primary considerations have animated the rather extensive discussion of this issue. First, there is the thought iterated by Justice Cardozo at the conclusion of his opinion for the Supreme Court in *Snyder* v. *Massachusetts*, 291 U.S. 97, 122, 54 S. Ct. 330, 78 L. Ed. 674: "There is danger that the criminal law will be brought into contempt—that discredit will even touch the great immunities assured by the Fourteenth Amendment—if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free." While we respect the *Reardon* v. *Manson* court's and the *Oates* court's desire to protect defendants' criminal rights, the possibilities of prejudice to the defendants in the present case by being unable to cross-examine the chemist, Ms. Pernitis, seem gossamer indeed. The defendants' rights in these cir-

---

[15] In *Mancusi* v. *Stubbs*, 408 U.S. 204, 213, 92 S. Ct. 2308, 33 L. Ed. 2d 293, and *Dutton* v. *Evans*, 400 U.S. 74, 89, 91 S. Ct. 210, 27 L. Ed. 2d 213, the court emphasized that the mission of the confrontation clause is to ensure that the extrajudicial statement is admissible only when it bears sufficient indicia of reliability so that confrontation of the declarant is not deemed necessary. If the evidence is determined to be reliable so as to be admissible without violating the confrontation clause, whether the evidence could be deemed crucial should, it would seem, make no difference. *State* v. *Kreck*, 86 Wash. 2d 112, 121 n.3, 542 P.2d 782.

cumstances were adequately protected by available procedures for pretrial discovery, Practice Book, 1978, §§ 741, 745, and subpoenaing of the witness during trial. See, e.g., *People* v. *Gower,* 42 N.Y.2d 117, 121, 366 N.E.2d 69; *State* v. *Walker,* 53 Ohio St. 2d 192, 197, 374 N.E.2d 132.

Secondly, we note the concern expressed by Justice Harlan in his concurrence in *Dutton* v. *Evans,* supra, 95–96: "A rule requiring production of available witnesses would significantly curtail development of the law of evidence to eliminate the necessity for production of declarants *where production would be unduly inconvenient and of small utility to a defendant.* Examples which come to mind are the Business Records Act, 28 U.S.C. §§ 1732–1733, and the exceptions to the hearsay rule for official statements, learned treatises, and trade reports. See, e.g., Uniform Rules of Evidence 63 (15), 63 (30), 63 (31); *Gilstrap* v. *United States,* 389 F.2d 6 (CA5 1968) (business records); *Kay* v. *United States,* 255 F.2d 476 (CA4 1958) (laboratory analysis). If the hearsay exception involved in a given case is such as to commend itself to reasonable men, production of the declarant is likely to be difficult, unavailing, or pointless." [16] (Emphasis added.)

---

[16] See note, "Confrontation and the Hearsay Rule," 75 Yale L.J. 1434, 1436: "Despite the superficial similarity between the evidentiary rule and the constitutional clause, the Court should not be eager to equate them. Present hearsay law does not merit a permanent niche in the Constitution; indeed, its ripeness for reform is a unifying theme of evidence literature. From Bentham to the authors of the Uniform Rules of Evidence, authorities have agreed that present hearsay law keeps reliable evidence from the courtroom. If *Pointer* has read into the Constitution a hearsay rule of unknown proportions, reformers must grapple not only with centuries of inertia but with a constitutional prohibition as well." (Footnotes omitted.)

In the present case, the burden to the state of producing the chemist is not inconsiderable for the chemist would not take the place of the state toxicologist whose testimony would in all likelihood still be required as to, inter alia, (1) his statements in the report, (2) the reliability of the procedures the laboratory uses, (3) the chain of custody of the substance examined which is not disputed here, and (4) the procedures he conducted that are important to the reliability of the tests.[17]  Moreover, if the production of the chemist is deemed mandated by the confrontation clause in this case, it would seem that anyone involved in the tests would have to be produced, e.g., the person charged with ensuring the laboratory machines' accuracy.  The laboratory could be quickly decimated and the court dockets congested waiting for the testimony of the laboratory personnel.[18]  We have already discussed our consensus as to the utility of the production of the chemist at trial to the defendants which we need not reiterate.

In *Chambers* v. *Mississippi,* 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297, the court stated: "the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  The court's case-by-case approach in resolving perceived conflicts between the confrontation clause and exceptions to hearsay rules apparently recognizes that the constitutional provision was not intended "to serve as a rigid and

---

[17] In the present case, Dr. Reading conducted the test which verified that the certified standard substance used in one of the laboratory procedures was indeed marijuana.

[18] See note 3, supra, for a view of the concerns of the legislature for keeping laboratory personnel in the laboratory and not unnecessarily in the courtroom.

inflexible barrier against the orderly development of reasonable and necessary exceptions to the hearsay rule"; *Kay* v. *United States,* 255 F.2d 476, 480 (4th Cir.); see also 5 Wigmore, Evidence (3d Ed.) § 1397; but was "to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the [hearsay] statement.'" *Dutton* v. *Evans,* supra, 89. (Citation omitted.)

In the present case this court's concerns in holding the toxicological report admissible have been fully consistent with the Supreme Court's practical concern for the accuracy of the truth-determining process in criminal trials.

## III

The defendants also have claimed error in the admission of the opinion testimony of Dr. Reading that the substance examined by the state toxicological laboratory was marijuana, maintaining that the toxicologist's testimony was based on the observations of others and as such should have been excluded as inadmissible hearsay evidence. The defendants raise no confrontation clause claim here nor do they challenge Dr. Reading's qualifications as an expert. In these circumstances, the ruling by the trial court in issue is consistent with the accepted principle that an expert's testimony may be based on reports of others if the reports are those customarily relied on by such an expert in formulating an opinion. E.g., *State* v. *Cuvelier,* 175 Conn. 100, 107, 394 A.2d 185; *Brown* v. *United States,* 375 F.2d 310, 318 (D.C. Cir.); *Commonwealth* v. *Daniels,* 480 Pa. 340, 349, 390 A.2d 172; McCormick, Evidence (2d Ed.) § 15.

## IV

The defendants also contend that the court erred in not directing judgment of acquittal because the state failed to present sufficient evidence that the substance in question that the defendants possessed was marijuana so that the jury could not reasonably arrive at a finding of guilty. Practice Book, 1978, § 883 (adopted 1976). We have recently reiterated the test this court employs to determine whether the evidence is sufficient to sustain a verdict: " '[T]he issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. . . .' Each essential element of the crime charged must be established by such proof . . . and although it is within the province of the jury to draw reasonable, logical inferences from the facts proven, they may not resort to speculation and conjecture." *State* v. *Ballas,* 180 Conn. 662, 674, 433 A.2d 989, citing *State* v. *Saracino,* 178 Conn. 416, 419, 423 A.2d 102.

In addition to the toxicological report and Dr. Reading's testimony, which we conclude were properly admitted into evidence and which amply support the conclusion that the substance examined was marijuana, the state also offered the testimony of the police officer, Ernest Orgera, and the representations made by the defendants to the two Stamford officers as evidence that the large quantity of the plant-like substance controlled by the defendants was marijuana. Since the testimony of Dr. Reading, which we have discussed earlier, referred to the examination of leaves of the plant-like sub-

stance and the toxicological report noted clearly
that the substance examined was green plant mate-
rial and viable seeds; this evidence alone was ade-
quate to demonstrate that the material was mari-
juana as defined in General Statutes § 19-443 (29).[19]
See, e.g., *United States* v. *Burden*, 497 F.2d 385
(8th Cir.); *People* v. *Chavez*, 182 Colo. 216, 511
P.2d 883; *Barrett* v. *State*, 329 N.E.2d 58 (Ind.
App.). See also *Valdez* v. *State*, 135 Tex. Crim.
201, 117 S.W.2d 459. See, generally, annot., "Suffi-
ciency of prosecution proof that substance defend-
ant is charged with possessing or selling, or other-
wise unlawfully dealing in, is marijuana," 75
A.L.R.3d 717.

In light of our disposition of this issue we need
only note that it has been held that a substance
allegedly possessed or sold by a criminal defendant
was sufficiently identified as marijuana by the testi-
mony of law enforcement officers only, with no proof
as to chemical analysis or examination having been
offered. E.g., *State* v. *Ostwald*, 591 P.2d 646, 652
(Mont.); *State* v. *Maupin*, 42 Ohio St. 2d 473, 479–

[19] "[General Statutes] Sec. 19-443. DEFINITIONS. . . . (29) "Mari-
huana" means all parts of any plant, or species of the genus cannabis
or any infra specific taxon thereof, whether growing or not; the
seeds thereof; the resin extracted from any part of the plant; and
every compound, manufacture, salt, derivative, mixture, or prepara-
tion of such plant, its seeds or resin. It does not include the mature
stalks of such plant, fiber produced from such stalks, oil or cake
made from the seeds of such plant, any other compound, manu-
facture, salt, derivative, mixture or preparation of such mature
stalks, except the resin extracted therefrom, fiber, oil, or cake, or
the sterilized seed of such plant which is incapable of germination.
Included are cannabinon, cannabinol or cannabidiol and chemical
compounds which are similar to cannabinon, cannabinol or can-
nabidiol in chemical structure or which are similar thereto in
physiological effect, and which show a like potential for abuse,
which are controlled substances under this chapter unless modi-
fied . . . ."

80, 330 N.E.2d 708; *Miller* v. *State*, 168 Tex. Crim. 570, 572, 330 S.W.2d 466. See, generally, annot., 75 A.L.R.3d 717. As to whether a policeman may as a threshold matter render an opinion that a substance is a narcotic such as marijuana, see Part V infra.

It has also been held that an individual's conversations concerning the nature of the substance in his possession and the price paid or asked for the substance can be evidence on the issue of the identity of the item as a narcotic substance. E.g., *United States* v. *Lawson*, 507 F.2d 433, 439 (7th Cir.), cert. denied, 420 U.S. 1004, 95 S. Ct. 1446, 43 L. Ed. 2d 762; *United States* v. *Atkins*, 473 F.2d 308, 314 (8th Cir.); *United States* v. *Agueci*, 310 F.2d 817, 828 (2d Cir.); *State* v. *Wind*, 60 Wis. 2d 267, 272, 208 N.W.2d 357.

The court did not err in failing to direct a judgment of acquittal.

## V

The defendants next claim of error involves the admission of the Stamford police officer Ernest Orgera's opinion that the substance which the defendants had in their possession was marijuana. The officer was shown to be familiar with marijuana through special training and experience. The clear weight of reported authority permits an experienced police officer to testify and express an opinion that a substance is marijuana; e.g., *State* v. *Guillen*, 218 Kan. 272, 274, 543 P.2d 934; *State* v. *Ostwald*, 591 P.2d 646, 652 (Mont.); *State* v. *Maupin*, 42 Ohio St. 2d 473, 479, 330 N.E.2d 708; *Cory* v. *State*, 543 P.2d 565 (Okla. Crim. App.); and the defendants have not cited us a single authority to the contrary.

The above cited cases specifically illustrate the settled general proposition in this state that the qualifications of an expert to render an opinion lies within the discretion of the trial court and that the trial court's decision will not be disturbed on appeal unless it has been abused, or the error is clear and involves a misconception of law. *State* v. *Castagna,* 170 Conn. 80, 90, 364 A.2d 200; *State* v. *Williams,* 169 Conn. 322, 332–33, 363 A.2d 72. The trial court did not abuse its discretion since the police officer here could reasonably be viewed as possessing special skill or knowledge beyond the ken of the ordinary person which would be of aid to the jury in determining the questions at issue. See *Going* v. *Pagani,* 172 Conn. 29, 35, 372 A.2d 516; *Siladi* v. *McNamara,* 164 Conn. 510, 513–14, 325 A.2d 277.

## VI

The defendants' last claim with respect to testimony concerning the marijuana in issue in this case apparently[20] involves the contention that the trial court erred in denying defense counsel the right to review the notes Dr. Reading made the morning of his trial testimony concerning the weight of the plant substance in the two individual bags put in evidence. In the present case we see no reason to depart from the principle we expressed in *State* v. *Watson,* 165 Conn. 577, 593, 345 A.2d 532: "It has been the practice in our trial courts to follow the majority rule 'that where a witness has refreshed his present recollection prior to the time

---

[20] It is unclear from the record whether the defendants properly objected at trial so as to preserve this claim for appeal. See *State* v. *Stevens,* 178 Conn. 649, 656-57, 425 A.2d 104. Nonetheless, again, see footnote 5, supra, we give the defendants the benefit of our doubts and reach the merits of their claim.

of giving testimony, by the use of papers or memoranda out of court, he is not, unless the court in its discretion orders otherwise, obliged to produce them to allow the opposing party to make an inspection.' Annot., 82 A.L.R.2d 562, § 63, and cases cited. We see no justification at this time to change our rules so as to allow counsel to inspect any material that may have been used by a witness to refresh his recollection prior to taking the witness stand. Whether such inspection be allowed should remain in the sound discretion of the trial judge."

## VII

The defendants also contend that the trial court erred in denying their motion to suppress evidence of the plant substance seized in the Showboat Motor Inn in Greenwich. They claim that the search warrant was executed in violation of General Statutes § 54-33a (b) in that it was executed by Stamford policemen who were outside their jurisdiction in the town of Greenwich. See General Statutes § 7-281. We do not agree.

The search warrant was executed within the town of Greenwich by six police officers, four of whom were from the Stamford police department and two of whom were Greenwich police officers. The fact that Stamford officers accompanied the Greenwich policemen to the premises and participated in the search does not require that the evidence seized be suppressed. Several jurisdictions have considered similar factual situations under like statutory limitations and concluded in each instance that the executions involved were legal. The defendants have not cited us to any authority to the contrary.

In *Kirby* v. *Beto*, 426 F.2d 258 (5th Cir.), cert. denied, 400 U.S. 919, 91 S. Ct. 181, 27 L. Ed. 2d 159,

four Dallas police officers accompanied by one Irving police officer served a search warrant outside the city limits of Dallas inside the city limits of Irving. The court stated that "[i]t is immaterial whether others unauthorized to execute the warrants were present and assisted." Id., 260. See also *State* v. *Wise,* 90 N.M. 659, 661, 567 P.2d 970; *State* v. *Hammond,* 270 S.C. 347, 353, 242 S.E.2d 411; *Commonwealth* v. *Kunkel,* 408 A.2d 475, 476–77 (Pa. Super.) ; 68 Am. Jur. 2d, Search and Seizure § 108, p. 76.

The defendants further claim the execution of the return of the search warrant by Stamford policeman Ernest Orgera voids the validity of the search and seizure. Again it should be noted that the defendants cite no authority in support of their contention in these or similar circumstances. The return and filing of the search warrant by officer Orgera must be considered a ministerial act which did not provide a ground for voiding an otherwise valid search and negate the fact that Greenwich policemen participated in execution of the warrant. See, e.g., *People* v. *Law,* 55 Misc. 2d 1075, 287 N.Y.S.2d 565; *People* v. *Daily,* 157 Cal. App. 2d 649, 321 P.2d 469. See also *Commonwealth* v. *Cromer,* 365 Mass. 519, 313 N.E.2d 557, 521 n.3 and cases cited therein.

## VIII

The defendant Cosgrove also claims that the trial court erred in permitting the Stamford police officers, who originally met the defendants when off-duty, to testify to the hearsay statements of the defendant Pierro. The essence of the defendant Cosgrove's argument is that, since Pierro did not testify, Cosgrove's right of confrontation, secured

in these circumstances by *Bruton* v. *United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 476, was abridged because of his inability to cross-examine his codefendant. The short answer to the defendant Cosgrove's claim here is that extrajudicial statements or confessions by one defendant which do not directly inculpate the codefendant are not within the prohibition of *Bruton* v. *United States,* supra, and are admissible. *Bruton* reaches only those statements which implicate the complaining codefendant as well as the declarant. See, e.g., *State* v. *Oliver,* 160 Conn. 85, 97, 273 A.2d 867, cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115; *United States* v. *Castro,* 596 F.2d 674, 677 (5th Cir.) cert. denied, 444 U.S. 963, 100 S. Ct. 448, 62 L. Ed. 2d 375; *United States* v. *Belle,* 593 F.2d 487, 493 (3d Cir.); *Commonwealth* v. *Sampson,* 454 Pa. 215, 311 A.2d 624, 627.

Our careful review of the transcript fails to reveal any statement attributed to the defendant Pierro which can be considered to have inculpated the defendant Cosgrove. Cosgrove's brief alludes to no statement of Pierro's which inculpates him and, in fact, contains no allegation that Pierro's statements were inculpatory of Cosgrove. See *State* v. *Festo,* 181 Conn. 254, 435 A.2d 38. The trial court did not err in admitting the testimony of the Stamford police officers to whom the defendant Pierro attempted to sell marijuana.

There is no error.

In this opinion the other judges concurred.